# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Plaintiffs Dale Toal and Claude Matt, individually and on behalf of all others similarly situated, | )<br>)<br>) CIVIL ACTION NO.<br>)<br>) |
| Plaintiffs, | ) CLASS ACTION COMPLAINT<br>) |
| v. | ) JURY TRIAL DEMANDED<br>) |
| ANTONIO M. PEREZ, RICHARD S. BRADDOCK, HERALD Y CHEN, ADAM H. CLAMMER, TIMOTHY M. DONAHUE, MICHAEL J. HAWLEY, WILLIAM H. HERNANDEZ, DOUGLAS R. LEBDA, KYLE P. LEGG, DELANO E. LEWIS, WILLIAM G. PARRETT, JOEL SELIGMAN, DENNIS F. STRIGL, LAURA D'ANDREA TYSON, DEBRA L. LEE, SAVINGS AND INVESTMENT PLAN COMMITTEE, FRANK S. SKLARSKY, ANTOINETTE P. McCORVEY, PAUL DILLS  and DOES 1-10, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

Plaintiffs Dale Toal and Claude Matt ("Plaintiffs"), on behalf of the Eastman Kodak Employees' Savings and Investment Plan ("SIP") and the Kodak Employee Stock Ownership Plan ("ESOP") (collectively the "Plan" or "Plans"), and themselves and a class of all other similarly situated Plan participants, allege as follows:

## INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries.

2.      Plaintiffs were participants in the Plans during the Class Period, during which time the Plans held interests in the common stock of Eastman Kodak Company (also referred to herein as "Kodak" or the "Company").[1]  Plaintiffs' individual accounts in the Plans during the Class Period included Kodak stock.

3.      Plaintiffs allege that Defendants, as "fiduciaries" of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to them and to the other participants and beneficiaries of the Plans in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plans' holdings of Kodak stock.

4.      Specifically, Plaintiffs allege in Count I that Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plans' participants and beneficiaries by failing to prudently and loyally manage the Plans' investment in Company equity by:  (1) continuing to offer Kodak common stock as a investment option for the Plans when it was imprudent to do so; (2) failing to provide complete and accurate information to the Plans' participants regarding the Company's financial condition and the prudence of investing in Company stock; and (3) maintaining the Plans' preexisting significant investment in Kodak equity when Company stock was no longer a prudent investment for the Plans.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide retirement funds for

---

[1]      While Kodak was a fiduciary of the Plans during the Class period, because the Company filed a petition for bankruptcy relief under Chapter 11 of the U.S. Bankruptcy Code on January 19, 2012, the Company is not named as a defendant in this action.  Plaintiffs, however, reserve the right to add Kodak as a defendant in the event it becomes necessary at a later date.  Further, according to the Eastman Kodak Employees' Savings and Investment Plan, as amended 1999 ("1999 SIP Plan Document"), "The Plan and Trust will terminate as to any participating corporation which will be legally dissolved or declared bankrupt…"  1999 SIP Plan Document at § 12.02.  However, the document specifically notes "**this provision will not apply in the case of reorganizations involving Eastman Kodak Company** and/or its subsidiaries or Affiliated Companies." *Id.* (emphasis added).

participants.  *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

5.      Plaintiffs' Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plans' and their participants' best interests in mind.

6.      Plaintiffs' Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of the Plans' assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plans to continue offering Kodak stock as an investment option, and investing the Plans' assets in Kodak stock when it was no longer prudent to do so.

7.      Plaintiffs allege that Defendants allowed the imprudent investment of the Plans' assets in Kodak equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent in light of the Company's dire financial condition, which as explained in detail below, included among other things: (a) a drastic deterioration in consumer demand for Kodak's outdated film products; (b) Kodak's failed strategy to market its film products to emerging markets; (c) Kodak's utter failure to adapt to digital technology; (d) Kodak's inability to bring the necessary amount of new products to the market quickly enough to mitigate the financial damage inflicted by the loss of film sales; (e) the failure of Kodak's short-sighted strategy of generating cash-flow from patent lawsuits; (f) a severe and imminent lack of liquidity.

8.     A prudent fiduciary would have recognized that as a consequence of the above, the Plans' significant investment of employees' retirement savings in Company stock would inevitably result in significant losses to the Plans and, consequently, to the Plans' participants.

9.     Plaintiffs seek to recover losses to the Plans for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Because Plaintiffs' claims apply to the Plans, inclusive of all participants with accounts invested in Company stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiffs here to sue for relief to the Plans for breaches of fiduciary duty such as those alleged herein, Plaintiffs bring this action as a class action on behalf of the Plans and all participants and beneficiaries of the Plans during the proposed Class Period.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plans are administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Kodak has its principal place of business in this district.  Further, many of the Plans' participants are located in or within close proximity to this district.

## PARTIES

**Plaintiffs**

12.     Plaintiff Dale Toal is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement investment portfolio during the Class Period.

13.     Plaintiff Claude Matt is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Kodak shares in his retirement investment portfolio during the Class Period.

**Defendants**

**Director Defendants**

14.     Defendant Antonio M. Perez ("Perez") has served as Kodak's Chief Executive Officer ("CEO") since May 2005.   In December 2005, Perez was elected as Chairman of the Board of Directors of Eastman Kodak Company (the "Board").   Perez initially joined Kodak in April 2003 as the Company's President and Chief Operating Officer ("COO").   During the Class Period, Defendant Perez was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

15.     Defendant Richard S. Braddock ("Braddock") has served as a member of the Board since 1987.   During the Class Period, Defendant Braddock was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

16.     Defendant Herald Y. Chen ("Chen") served as a member of the Board from September 2009 until December 2011.   During the Class Period, Defendant Chen was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

17.     Defendant Adam H. Clammer ("Clammer") served as a member of the Board from September 2009 until December 2011.  During the Class Period, Defendant Clammer was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

18.     Defendant Timothy M. Donahue ("Donahue") has served as a member of the Board since 2001.  During the Class Period, Defendant Donahue was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

19.     Defendant Michael J. Hawley ("Hawley") has served as a member of the Board since 2004.  During the Class Period, Defendant Hawley was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

20.     Defendant William H. Hernandez ("Hernandez") has served as a member of the Board since 2003.  During the Class Period, Defendant Hernandez was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

21.     Defendant Douglas R. Lebda ("Lebda") has served as a member of the Board since 2007.  During the Class Period, Defendant Lebda was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised

discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

22. Defendant Debra L. Lee ("Lee") has served as a member of the Board since 1999. During the Class Period, Defendant Lee was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

23. Defendant Kyle P. Legg ("Legg") has served as a member of the Board since September 2010. During the Class Period, Defendant Legg was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

24. Defendant Delano E. Lewis ("Lewis") has served as a member of the Board since 2001. During the Class Period, Defendant Lewis was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

25. Defendant William G. Parrett ("Parrett") has served as a member of the Board since 2007. During the Class Period, Defendant Parrett was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

26.     Defendant Joel Seligman ("Seligman") has served as a member of the Board since July 2009.  During the Class Period, Defendant Seligman was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

27.     Defendant Dennis F. Strigl ("Strigl") has served as a member of the Board since 2008.  During the Class Period, Defendant Strigl was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

28.     Defendant Laura D'Andrea Tyson ("Tyson") served as a member of the Board from 1997 until December 2011.  During the Class Period, Defendant Tyson was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

29.     Defendants Perez, Braddock, Chen, Clammer, Donahue, Hawley, Hernandez, Lebda, Lee, Legg, Lewis, Parrett, Seligman, Strigl, and Tyson are collectively referred to as the "Director Defendants."  During the Class Period, upon information and belief, the Director Defendants, among other duties, had the duty to appoint and monitor the members of the Administrative Committee of the Plans (defined below).

**Administrative Committee Defendants**

30.     The Savings and Investment Plan Committee ("SIPCO") was the Plan Administrator and Named Fiduciary of the SIP.  *See* Eastman Kodak Employees' Savings And Investment Plan, effective January 1, 2000 ("2000 SIP Plan Document") (attached hereto as

Exhibit A), at § 3.02.[2]  Upon information and belief, a similar committee, likely comprised of the same members as the SIPCO administered the ESOP.[3]  The SIPCO and the committee responsible for administering the ESOP are collectively referred to as the "Administrative Committee."

31.    Defendant Frank S. Sklarsky ("Sklarsky") was, at relevant times, Chair of SIPCO, and signed the SIP Plan's Form 11-K filed with the SEC on June 26, 2009 for the year ending December 30, 2008 ("2008 Form 11-K"), and the SIP Plan's Form 11-K filed with the SEC on June 21, 2010 for the year ending December 30, 2009 ("2009 Form 11-K") in that role. Additionally, Defendant Sklarsky served as Kodak's Chief Financial Officer ("CFO") from 2006 until November 2010.  During the Class Period, Defendant Sklarsky was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

32.    Defendant Antoinette P. McCorvey ("McCorvey") was, at relevant times, Chair of SIPCO.  Defendant McCorvey signed the SIP Plan's Form 11-K filed with the SEC on June 23, 2011 for the year ending December 30, 2010 ("2010 Form 11-K").  Defendant McCorvey joined Kodak in 1999 and served as Director and Vice President of Investor Relations and Corporate Vice President before becoming the Company's CFO on November 5, 2010, replacing

---

[2]    The SIP, like other retirement plans, was subject to amendments and restatements.  Upon information and belief, the general provisions of the SIP Plan Document currently in effect remain the same as the provisions of the 2000 SIP Plan Document.

[3]    The entire composition of the SIPCO and its ESOP equivalent is not presently known to Plaintiffs. Plaintiffs believe that after a reasonable opportunity for discovery to obtain any committee charters, trust agreements, and other relevant information, the aforementioned documents will provide additional evidentiary support for the allegations set forth herein, including with respect to the composition of the Plans' committees during the Class Period.  Indeed, while Plaintiffs have modified the set of Defendant-fiduciaries in the instant submission in accordance with information they have obtained thus far, they reserve their right to further amend during and after discovery as determination of the identity and full breadth of responsibilities of ERISA fiduciaries is an inherently fact intensive effort.

Defendant Sklarsky.  During the Class Period, Defendant McCorvey was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

33.     Defendant Paul Dils ("Dils") was, at relevant times, a Plan Administrator for ESOP.  Defendant Dils signed the ESOP's Form 5500 filed with the Internal Revenue Service ("IRS") for the year ending December 31, 2009 (filed October 12, 2010) and the year ending December 31, 2010 (signed September 29, 2011).  During the Class Period, Defendant Dils was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over the Plans' management and/or authority or control over management or disposition of the Plans' assets.

34.     Defendants Sklarsky, McCorvey, and Dils are, collectively, the "Administrative Committee Defendants."

**Additional "John Doe" Defendants**

35.     To the extent that there are additional Company officers, directors and employees who were fiduciaries of the Plans during the Class Period, including members of the Administrative Committee, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 1-10 include other individuals, including Company officers, directors and employees who were fiduciaries of the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

**THE PLANS**

36.     The Plans are "employee pension benefit plans," as defined by ERISA § 3(2)(A).  Each Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1).  However, in a breach

of fiduciary duty action such as this, the Plans are neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants and beneficiaries.

## Savings and Investment Plan ("SIP")

### a.    Purpose

37.    The purpose of the SIP was to help its participants save for retirement. 2000 SIP Plan Document, § 1.01.

### b.    Eligibility and Administration

38.    The SIP Plan is available to certain employees of Kodak and certain of its subsidiaries in the United States. *See* 2010 Form 11-K, filed with the Securities and Exchange Commission ("SEC") ("2010 Form 11-K"). Specifically, according to the 2010 Form 11-K, regular full-time, regular part-time, supplementary or conditional employees of the Company are eligible to participate in the Plan upon date of hire. *See* 2010 Form 11-K at 6.

39.    The Plan is sponsored by Kodak and administered by the Company through the SIPCO. *Id.*; *see also* 2000 SIP Plan Document at § 3.01 ("The Board will appoint SIPCO to control and manage the operation and administration of the Plan…."). The 2000 SIP Plan Document specifies that SIPCO will be the Named Fiduciary and Plan Administrator as those terms are used in ERISA. *Id.* at § 3.02.

40.    Further, the 2000 SIP Plan provides that SIPCO "will administer the Plan in accordance with its terms and will have all powers necessary to carry out the provisions of the Plan, except such powers as are specifically reserved to the Board, the Senior Vice President and Director, Human Resources, or some other person." *Id.* at § 3.03. The section continues, noting SIPCO "will have the power, the duty, and the **complete and exclusive discretion**," *inter alia*, "**to construe, interpret, and administer the terms of the Plan**." *Id.* (emphasis added).

11

41.     The 2000 SIP Plan Document also vested SIPCO with the power to "appoint such accountants, attorneys, investment advisors, Investment Managers, specialists, and other persons as it deems necessary or desirable in connection with the administration of this Plan." *Id.* at § 3.06.

42.     Further, SIPCO "is responsible for appointing and removing the Trustee" pursuant to the 2000 SIP Plan Document. *Id.* at § 3.10.

43.     Beyond vesting the Board with the power to establish SIPCO, the 2000 SIP Plan Document also specifies that "the Board will be responsible for appointing and removing members of SIPCO, and the Board or the Senior Vice President and Director, Human Resources will be responsible for amending and terminating the Plan and Trust." *Id.*

44.     Further, the Board may "at any time, and from time to time, to modify or amend in whole or in part any or all of the provisions of the Plan." *Id.* at § 11.01.

        **c.     Contributions**

45.     During the Class Period, the Plan purchased shares of Kodak common stock and held it in a trust for allocation to eligible participants' accounts.  According to the 2010 Form 11-K, the SIP Plan's Trust is administered by BNY Mellon Financial Corporation.  *See* 2010 Form 11-K at 6.

46.     Kodak stock is allocated based on a participant's earnings or account balances, as defined in the SIP Plan document.

47.     As noted in the 2010 Form 11-K, the SIP includes a deferred salary provision allowing eligible Kodak participants to defer up to a certain percentage of eligible compensation as defined in the SIP.  The maximum deferral for Plan years 2010 and 2009 was limited to 75% of the aggregate of eligible salary and certain related incentive compensation.  *See* 2010 Form 11-K at 6.

48.     Effective January 1, 2000, Kodak began   to match SIP contributions for an amount up to 3% of wages for employees who contributed up to 5% of their wages to SIP and who also participated in the Cash Balance Plus portion of the Kodak Retirement Income Plan. *Id.*

49.     Effective January 1, 2009, Kodak suspended its matching contributions to the SIP. However, effective January 1, 2010, the Company reinstated its matching contributions.  *Id.*

50.     According to information posted on the website of the SIP's record keeper, T. Rowe Price's Retirement Plan Services Participant Website,[4] when a Cash Balance Participant contributes by salary deferral up to 5% of his or her pay per pay period to SIP, the Company will contribute an amount equal up to 3% of the Participant's pay for that period to his or her SIP account.  The Company will match dollar for dollar on the first 1% contributed to SIP and 50 cents for each dollar on the next 4% contributed.  *See* T. Rowe Price Retirement Plan Services Participant Website, information on Eastman Kodak Employees' Savings and Investment Plan Features, available at:   http://www3.troweprice.com/rws/participants/v/index.jsp?vgnextoid= 63976a1770961210VgnVCM1, last accessed February 14, 2012.

51.     Participants are vested immediately in their contributions, Company matching contributions, and actual earnings.  See 2010 Form 11-K; see also T. Rowe Price Retirement Plan Services Participant Website, information on Eastman Kodak Employees' Savings and Investment Plan Features, available at:   http://www3.troweprice.com/rws/participants/ v/index.jsp?vgnextoid=63976a1770961210VgnVCM1, last accessed February 14, 2012.

---

[4]     *See* 2010 Form 10-K at 6, identifying T. Rowe Price Retirement Plan Services, Inc. as the SIP Plan record keeper.

52.     As of December 30, 2008, when Company stock was valued at $6.33 per share, the SIP held 3,397,000 shares of Company stock, valued at $21,504,000.  *See* 2008 Form 11-K, filed with the SEC Jun3 26, 2009.

53.     As of December 30, 2009, when Company stock was valued at $4.34 per share, the SIP held 5,082,000 shares of Company stock, valued at $22,056,000.  *See* 2009 Form 11-K, filed with the SEC June 21, 2010.

54.     As of December 30, 2010, when Company stock was valued at $5.52 per share, the SIP held 5,484,000 shares of Company stock, valued at $30,270,000.  *See* 2010 Form 11-K, filed with the SEC on June 23, 2011.

**Employee Stock Ownership Plan**

55.     Fiduciaries of an employee stock ownership plan, such as the ESOP here, are bound by core ERISA fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.

56.     Accordingly, if the fiduciaries know or if an adequate investigation would reveal that company stock no longer is a prudent investment for the employee stock ownership plan, the fiduciaries must disregard plan direction to maintain investments in such stock, and protect the plan by investing the plan assets in other suitable investments.

## CLASS ACTION ALLEGATIONS

57.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, themselves and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Eastman Kodak Employees' Savings and Investment Plan and/or the Kodak Employee Stock Ownership Plan, at any time between April 30,

14

2009 and the present (the "Class Period") and whose Plan accounts included investments in Kodak common stock.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are at least several hundred members of the Class who participated in, or were beneficiaries of, the Plans during the Class Period and whose Plan accounts included investment in Kodak stock. According to the 2009 Form 5500 submission for the SIP, as of December 31, 2009, there were 34,436 participants in the SIP.

59.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether Defendants each owed a fiduciary duty to the Plans, Plaintiffs and members of the Class;

- whether Defendants breached their fiduciary duties to the Plans, Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans and the Plans' participants and Beneficiaries;

- whether Defendants violated ERISA; and

- whether the Plans and members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, the Plans and the other members of the Class all sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

61.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions, complex litigation,

and ERISA jurisprudence.  Plaintiffs have no interests antagonistic to or in conflict with those of the Plans or the Class.

62.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

63.     Class action status is also warranted under the other subsections of Rule 23(b) because:  (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

64.     During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plans, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plans and/or the management or disposition of the Plans' assets.

65.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

66.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control

respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

67.     Each of the Defendants was a fiduciary -- either as a named fiduciary or *de facto* fiduciary -- with respect to the Plans and owed fiduciary duties to the Plans and their participants under ERISA in the manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

68.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

69.     The 2000 SIP Plan Document acknowledged as much, setting out standards of conduct consistent with ERISA's prudent man standard (*see* ERISA § 404(a)(1)(B). It provided:

> All fiduciaries under the Plan and Trust will act solely in the interests of the Participants and their beneficiaries and in accordance with the terms and provisions of the Plan and Trust insofar as such documents are consistent with ERISA, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Any person may serve in more than one fiduciary capacity with respect to the Plan and Trust.

*Id.* at § 3.08.

70.     Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration.   Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

71.     Upon information and belief, instead of delegating all fiduciary responsibility for the Plans to external service providers, the Company through the Board chose to assign the appointment and removal of fiduciaries, such as the members of the Administrative Committee, to itself.

72.     ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plans' sponsor.

73.     During the Class Period, all of Defendants acted as fiduciaries of the Plans pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**Director Defendants' Fiduciary Status**

74.     The Director Defendants were responsible for the appointment of members to SIPCO.  *See* 2000 SIP Plan Document at § 3.01.

75.     Moreover, because the Board had the authority to appoint members of the SIPCO, and upon information and belief the committee in charge of administering the ESOP, it had the duty to monitor the activities of these committees.  *See* 2000 SIP Plan Document at § 3.01 (the "Board may at any time remove a member of SIPCO and appoint a successor.")

76.     As a result, the Director Defendants had the ultimate responsibility for appointing, monitoring, and if necessary, removing Kodak officers/employees delegated duties with respect

to the administration and management of the Plans and management of the Plan's assets, including members of SIPCO.

## SIPCO's Fiduciary Status

77.     SIPCO is the "Named Fiduciary and Plan Administrator as those terms are used in ERISA." *See* 2000 SIP Plan Document at § 3.02.

78.     These Company officers/employees who comprised SIPCO were appointed by the Kodak Board and were delegated the day-to-day responsibility for the administration of the Plans and the Plans' assets.

79.     In particular, members of SIPCO were given the duty to "administer the Plan in accordance with its terms."   *Id.* at § 3.03.   Further, the 2000 SIP Plan Document stated that SIPCO "will have all powers necessary to carry out the provisions of the Plan, except such powers as are specifically reserved to the Board, the Senior Vice President and Director, Human Resources, or some other person."  *Id.*   The section continues, noting SIPCO "will have the power, the duty, and the **complete and exclusive discretion**," *inter alia*, "**to construe, interpret, and administer the terms of the Plan**."  *Id.* (emphasis added).

80.     The 2000 SIP Plan Document also vested SIPCO with the power to "appoint such accountants, attorneys, investment advisors, Investment Managers, specialists, and other persons as it deems necessary or desirable in connection with the administration of this Plan."  *Id.* at § 3.06.

81.     Further, SIPCO "is responsible for appointing and removing the Trustee" pursuant to the 2000 SIP Plan Document.  *Id.* at § 3.10.

## Additional Fiduciary Aspects of Defendants' Actions/Inactions

82.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary

functions.  ERISA § 3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i), provides that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ."  During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

83.   Further, ERISA mandates that pension plan fiduciaries have a duty of loyalty to the plan and its participants which includes the duty to speak truthfully to the plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

84.   Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct any inaccurate or misleading information so that plan participants will not be injured. *See, e.g.*, *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 84 (2d. Cir. 2001) (confirming fiduciary may be liable for statements known to be false); *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions.").

85.   During the Class Period, upon information and belief, the Company made direct and indirect communications with the Plans' participants including statements regarding investments in Company stock.  These communications included, but were not limited to, SEC

filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company stock), which included and/or reiterated these statements.  Upon information and belief, at all times during the Class Period, Kodak's SEC filings were incorporated into and part of such SPDs and/or a prospectuses.  Thus, Defendants also acted as fiduciaries to the extent of their communications with Plan participants.

86.     Further, Defendants, as the Plans' fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) literature and the trade press,[5] concerning investment in company stock, including that:

(a)     Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)     Out of loyalty, employees tend to invest in company stock;

(c)     Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)     Employees tend not to change their investment option allocations in the plan once made;

(e)     No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

---

[5]     *See* David K. Randall, *Danger in Your 401(k)*, Forbes.com (August 30, 2010) (available at: http://www.forbes.com/forbes/2010/0830/health-retirement-savings-erisa-danger-in-401k_print.html); Liz Pulliam Weston, *7 Ways to Mess Up Your 401(k)*, MSN.com (December 31, 2007) (available at: http://articles.moneycentral.msn.com/RetirementandWills/InvestForRetirement/7MostCommon401kBlunders.aspx); Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans*, Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s*, MSNBC.com (June 20, 2006) (available at:  http://www.msnbc.msn.com/id/12976549/) ; Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116   Q.   J.   Econ.   4,   1149   (2001)   (available   at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design*, Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

87.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plans' funds in Company stock, they still took no action to protect the Plans' assets from their imprudent investment in Company stock.

### SUBSTANTIVE ALLEGATIONS

**A.     Background – The Company's Traditional Business Model Becomes Obsolete**

88.     The history of Kodak dates back to the late nineteenth century, when George Eastman introduced the first Kodak camera.  *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3.  In 1901, the company as it is known today, Eastman Kodak Company of New Jersey, was formed under the laws of New Jersey (where the Company continues to be incorporated).  *See* 2009 Form 10-K. filed with the SEC ("2009 Form 10-K").   In 1930, the Eastman Kodak Company was added to the Dow Jones Industrial    Average    index,    where    it    would    remain    until    2004.    *See* http://www.telegraph.co.uk/finance/newsbysector/retailandconsumer/9024539/Kodak-130-years-of-history.html.

89.     "George Eastman built his company by turning photography from a highly skilled pursuit to a pastime for ordinary people.  The ease of use of Kodak's cameras made them enormously popular and precipitated a high-margin film business that Kodak monopolized until the 1980s."  *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3.

90.     According to a 2005 Harvard Business School case study[6], up until 1976, Kodak garnered 90% of U.S. film sales and 85% of U.S. camera sales.

91.     To say that Kodak's fortune was made in film is no understatement.  For most of its history, Kodak depended upon the "razor-blade strategy."  That is just as Gillette makes its money on the blades, not the razors, Kodak sold relatively inexpensive cameras, but generated a large amount of revenue from selling film, papers and chemicals.  *See* "The Last Kodak Moment?"      The      Economist      (January      14,      2012),      available      at: http://www.economist.com/node/21542796.

92.     The SIP was established during this time period when Kodak reigned supreme in the photography film.  According to the 2000 SIP Plan Document, the first iteration of the SIP was established in 1960 by the Company.  *See* 2000 SIP Plan Document, § 1.02.  For much of the next three decades, the Company stuck to its core film business model making a fortune in the photography industry.

93.      Kodak's monopolization of the photography industry began to erode by the 1980s as competition began to creep in, and the industry was changing.  By the 1980s digital technology began to replace the need for film, and then more recently, smartphones deeply dented the demand for digital cameras.  *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3.  Kodak's viability depended upon its ability to adapt to these new market forces.  Kodak failed to adapt.

94.     Kodak's descent into oblivion was gradual but sure. "In 1988, Kodak employed 145,000 workers worldwide; at last count barely one-tenth as many."  *See* "The Last Kodak Moment?"      The      Economist      (January      14,      2012),      available      at:

---

[6]     *See* Gavetti, G., Henderson, R., Giorgi, S., Kodak and the Digital Revolution (A), Harvard Business School, 2005.

http://www.economist.com/node/21542796.   In fact, it now employs only 17,000 people worldwide, less than twelve percent (12%) of the prior figure.  *See* "What's Wrong with this Picture: Kodak's 30-year Slide into Bankruptcy," *Knowledge@Wharton*, February 1, 2012, at 1.

95.     In 2001, in an effort to stem the bleeding, Kodak looked eastward.  It attempted to develop its traditional film business in secondary cities, towns, and vast rural areas in China's central and west provinces.  *See* "Kodak's China Strategy Not Black-and-White," *China Daily*, May 10, 2004 at 1.  This region of China had more than 1 billion people and Kodak believed "the business in the region" would "boom."  *Id.*  However, this attempt by the Company would fail.  As reported by the *Economist*, "Kodak … failed to read emerging markets correctly.  It hoped that the new Chinese middle class would buy lots of film.  They did for a short while, but then decided that digital cameras were cooler.  Many leap-frogged from no camera straight to a digital one."  *See* "The Last Kodak Moment?" The Economist (January 14, 2012), available at: http://www.economist.com/node/21542796.

96.     By 2003, "the onset of digital photography eroded demand for traditional film" by so much that Kodak said it "would halt investing in its longtime product."  Michael J. De La Merced, "Eastman Kodak Files for Bankruptcy," *NTTImes.Com¸* January 19, 2012, at 1.

97.     Since 2003, Kodak has closed 13 manufacturing plants and 130 processing labs. *See* "What's Wrong with this Picture: Kodak's 30-year Slide into Bankruptcy," *Knowledge@Wharton*, February 1, 2012, at 1.

98.     As reported by the *Economist*, Kodak saw change coming but did nothing about it.  "Larry Matteson, a former Kodak executive who now teaches at the University of Rochester's Simon School of Business, recalls writing a report in 1979 detailing, fairly accurately, how different parts of the market would switch from film to digital, starting with government

reconnaissance, then professional photography and finally the mass market, all by 2010." *See* "The Last Kodak Moment?" The Economist (January 14, 2012), available at: http://www.economist.com/node/21542796.

99.     There were reasons for Kodak's lackadaisical attitude toward change.  One was that despite its strengths—hefty investment in research, a rigorous approach to manufacturing and good relations with its local community—Kodak had become a complacent monopolist.  *Id.*

100.    "Another reason why Kodak was slow to change was that its executives 'suffered from a mentality of perfect products, rather than the high-tech mindset of make it, launch it, fix it,' says Rosabeth Moss Kanter of Harvard Business School, who has advised the firm."  *Id.*

101.    The impact of losing its foothold in the film photography industry were readily apparent.  As demonstrated in the chart below, from 2003 to 2008, Kodak stock greatly underperformed compared to the S&P 500 and Dow Jones US Industrial Average:



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN***
Among Eastman Kodak Company, The S&P 500 Index
And The Dow Jones US Industrial Average Index

*$100 invested on 12/31/03 in stock & index-including reinvestment of dividends.
Fiscal year ending December 31.

Copyright © 2009 S&P, a division of The McGraw-Hill Companies Inc. All rights reserved.
Copyright © 2009 Dow Jones & Co. All rights reserved.

Source:  2010 Form 10-K.

102.    Thus, by the start of the Class Period and certainly leading up to Kodak's bankruptcy filing on January 19, 2012, it had become clear that Kodak's traditional business model had lost step with the changing times to its severe detriment.  According to one observer, Kodak's "decision to shutter the business … is the strongest symbol yet of the sea change in consumer electronics and *decades of missteps* that forced the former blue chip to seek bankruptcy protection…."  *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3 (emphasis added).

### B.      The Age of Digital Technology Dooms Kodak

103.    From the late 1990's until 2008, the digital still camera market in the U.S. grew from 4.5 million units (shipped in 2000) to 28.3 million units (shipped in 2007).  Beginning in 2008, however, the camera phone gained mainstream popularity.  *See* TechCrunch, "Where did Kodak's Moment Go?," *Seeking Alpha* (January 21, 2012), available at: http://seekingalpha.com/article/321065-where-did-kodak-s-moment-go.

104.    Kodak actually foresaw future trends.  In fact, Kodak invented the digital camera in 1975.  *See* "What's Wrong with this Picture: Kodak's 30-year Slide into Bankruptcy," *Knowledge@Wharton*, February 1, 2012, at 1.  However, out of fear that such technology would eat into the Company's film sales (which was the Company's cash cow), Kodak essentially stuck the digital camera in a vault, ignoring the inevitable industry shift that, while not imminent, would occur over the following decades.  *Id.*  This move would ultimately prove fatal.  And so, it was Sony, and not Kodak, that introduced the first digital camera to the market (the Sony Mavica in 1981).  *See* http://blog.sony.com/flashback-fridaysony-mavica-digital-camera-1981.

105.    Kodak was invested so heavily in film technology that it became difficult to abandon, according to Robert Shanebrook, who worked at Kodak from 1969 to 2003 and has documented the process in his book, *Making Kodak Film*.  *Knowledge@Wharton*, February 1, 2012, at 1.  "On top of foot-dragging into the digital world, Kodak had become 'bloated' in its heyday, and didn't know how to scale back during the past decade, according to Wharton operations and information management professor Kartik Hosanagar."  *Id.*

106.    Even when Kodak tried its hand at selling digital cameras it did so clumsily. George Fisher, who served as Kodak's boss from 1993 until 1999, "cranked out digital cameras and offered customers the ability to post and share pictures online."  *See* "The Last Kodak Moment?"   The   Economist   (January   14,   2012),   available   at:

http://www.economist.com/node/21542796.  "A brilliant boss might have turned this idea into something like Facebook, but Mr. Fisher was not that boss.  He failed to outsource much production, which might have made Kodak more nimble and creative. "  *Id.*  Moreover, Kodak's "razor blade" business model did not work with digital cameras.  *Id.*

107.     Eventually, the Company surrendered to the inevitability of digital cameras and began to sell them.  However, the industry had radically shifted again, this time to cameras on smartphones which "scuppered" Kodak's digital camera business.  *Id.*  Consumers were no longer interested in buying inexpensive digital cameras (which was what Kodak had been producing) when they could get relatively comparable camera quality on their cell phone.   On the other end of the spectrum, Kodak had already been edged-out of the high-end digital camera business by the likes of Canon, Nikon and Sony.  *See* Larry Magid, "Kodak's Impending Bankruptcy Not a Pretty Picture," Forbes (January 4, 2012), available at: http://www.forbes.com/sites/larrymagid/2012/01/04/kodaks-impending-bankruptcy-not-a-pretty-picture/.

108.     *Forbes* summed it up as follows:

> Kodak has had some success with its digital cameras where it was an early market leader, but it hasn't kept up with competition from Canon and Nikon or even Sony. Also, Kodak's main strength is in the lower-end point and shoot cameras and — as anyone who owns an iPhone 4s or a top-of-the-line Android phone knows, the role of low-end stand alone digital cameras is diminishing rapidly.  The photo quality of my iPhone 4s, while not quite as good as that of a $99 point and shoot camera — is good enough. If I'm going to bother carrying around a dedicated camera, it had better be one with an excellent lens and a high-end sensor and for those cameras, I'm more likely to turn to Canon or Nikon.

*See* Larry Magid, "Kodak's Impending Bankruptcy Not a Pretty Picture," *Forbes* (January 4, 2012), available at:   http://www.forbes.com/sites/larrymagid/2012/01/04/kodaks-impending-bankruptcy-not-a-pretty-picture/.

109.     Another observer remarked that "a large part of Kodak's problem is that more and more consumers don't buy a digital camera as a stand-alone device anymore: they get it as part of a smartphone. The most demanding photographers still have needs that only dedicated camera devices can meet, but the mass market is fine with the many megapixels provided by today's smartphones, especially the ones at the higher end (such as Apple's iPhone and RIM's higher-end BlackBerry devices). Those consumers avoid the extra cost, weight and space requirements of a separate digital camera." *Foss Patents*, "Eastman Kodak v. Apple and RIM: target date for ITC decision postponed by One Week," June 23, 2011.

### C.    Kodak's Attempt to Bring New Products to The Market Is An Utter Failure

110.     With demand for its film products eroded and having failed to capitalize on digital technology, Kodak was left with having to bring new products to the market in order to mitigate the financial damage inflicted by loss of film sales.  It failed to do so.  *See* Michael J. De La Merced, "Eastman Kodak Files for Bankruptcy," *NTTImes.Com¸* January 19, 2012, at 1 (noting that Kodak's strategy to "bet on inkjet printers" has "yet to bear fruit.").

111.     Kodak would focus much of its attention on the digital printer business, competing with such industry giants as HP and Canon.  If Kodak was to replace its film revenue with revenue from printer and ink sales, it would essentially have to dominate the industry, vastly overtaking its well-established competitors.

112.     The person charged with this undertaking was Defendant Perez who joined Kodak in 2003 as President, before being promoted to CEO in 2005.  *See* Mike Spector et al., "Kodak Teeters on the Brink," *The Wall Street Journal* (January 5, 2012), available at: http://online.wsj.com/article/SB10001424052970203471004577140841495542810.html.

113.    Beginning in 2007, Kodak entered the consumer printer market, and in contrast to nearly every other company, offered an expensive printer and cheap ink.    *See* http://blog.atlanticinkjet.com/general-cartridges-posts/the-latest-printer-ink-from-kodak-inkjet-a-shift-from-the-cheap-ink-approach.html.    Kodak was essentially *employing a reverse r*azor blade strategy (the opposite of its century-old business model), while its competitors in the printer market were using the razor blade strategy.    Kodak hoped that nanotechnology used in filmmaking would allow the Company to manufacture an ink that would not clog printer heads.

114.    Kodak's foray into the printer business was unsuccessful.

### D.    The Wheels have Fallen Off the Wagon

115.    By the fourth quarter of 2008, Kodak's traditional film business had disintegrated, attempts to revive that business were wholly unsuccessful, and Kodak stock had plummeted from a high of $90 in the mid nineteen nineties to $6.58 on December 31, 2008.  The Company stock was clearly no longer a prudent investment option.  The risk profile of Kodak had been altered to such an extreme that the Plans' settlor could not have reasonably foreseen that such would be the fate of the Company by the end of 2008 as contrasted from the time when the Plans were created.

116.    According to Defendant Perez, "the second half of 2008 will go down in history as one of the most challenging periods we have seen in decades." *See* Meg Tirrell, "Kodak to Cut Up to 4,500 Jobs, Restructure, Has Loss," *Bloomberg* (January 29, 2009), available at: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aZarwLZDLBZg.

117.    By February 2009, Kodak stated that it was bracing for a sales slump of between 12% and 18%"  *See* "Recession-hit Kodak Outlines New Strategy," *The Associated Press* (February 4, 2009), available at:  http://www.imaginginfo.com/web/online/News/Recession-Hit-Kodak-Outlines-New-Strategy/3$4759.

118.    The Class Period begins on April 30, 2009 because by that date the Company Stock was an imprudent investment for the Plans, the Plans' fiduciaries were aware of the Company's dire financial condition and the earnings announcements for the fourth quarter of 2008 *and* the first quarter of 2009, and the fiduciaries had been given ample time to take action to protect the Plans, but failed to do so.

119.    On April 30, 2009, the first day of the Class Period, Kodak reported a loss from continuing operations of $255 million, even worse than analysts had expected.  As such, the Company announced that it would stop paying its 25-cent semi-annual dividend.  Defendant Perez warned that the next quarter would "be a tough quarter," saying that if there were signs of recovery, it would not be until the third quarter.  *See* Meg Tirrell, Kodak Shares Drop as Loss Widens More Than Estimated, *Bloomberg* (April 30, 2009), available at: http://www.bloomberg.com/apps/news?pid=newsarchive&sid=a4yI3pyoCuCU.

120.    The quarterly loss was attributed to three factors– the continuing impact of the global recession, business seasonality and restructuring actions taken to address the economic climate.  Consumer Digital Imaging Group ("Digital Imaging") sales were $369 million for the quarter, representing a 33% decline from the prior year quarter.  Graphic Communications Group ("Graphic Communications") sales were $603 million, a 26% decline from the first quarter of 2008.  Film, Photofinishing and Entertainment Group ("Film") sales were $503 million, a 31% decline from the year-prior quarter.  Defendant Perez stated that the Company would continue to work on things within its control, "focusing on our core digital technologies, optimizing our portfolio of cash generating businesses, achieving the full potential of our transformational business, reducing our cost structure and conserving cash."  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (April 30, 2009).

121.    On the day of this announcement, Kodak stock closed at $3.05 per share.

122.    In June 2009, Kodak announced that it would discontinue production of its iconic Kodachrome color slide film (which had been sold since 1935).  Kodak stated that 70% of its revenue now came from digital business as opposed to film.  *See* "Kodak Retires KODACHROME Film; Celebrates Life of Oldest Film Icon in its Portfolio," (June 22, 2009), available at:  http://www.kodak.com/ek/ContentWithLeftCol.aspx?Pageid=28412&id=36997.

123.    Kodak attributed its dismal second quarter 2009 results to the "weak global economic climate," while at the same time forecasting improved results for the second half of the year.  The second quarter loss was $189 million, or ($0.70) per share—the Company's third straight quarterly loss.  Worldwide sales for the quarter totaled $1.766 billion, a decline of 29% from the second quarter of 2008.  Digital Imaging sales were $503 million, a 33% decline from the prior year quarter, while Graphic Communications sales were $670 million, a decline of 24% from the prior year quarter.  Film sales were $593 million, a 30% decline from the prior year quarter.  Kodak stated that it remained focused on three financial goals: digital and total company revenue; earnings from operations; and cash generation.  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (July 30, 2009).

124.    On the day of this announcement, Kodak stock closed at $2.94 per share.

125.    Kodak's third quarter, 2009 results were said to "demonstrate the success of continued focused investments that Kodak is making in new products and core growth businesses, especially consumer and commercial inkjet."  The Company's third quarter loss from continuing operations was $111 million, or ($0.41) per share.  The fact that such disappointing financial results were an "improvement" from the previous quarters' results" and were thought to illustrate "success" showed just how dire Kodak's situation had become.  In the third quarter of

2008, Kodak had earned $101 million, or $0.35 per share, a stark contrast to the loss reported for the same quarter of 2009.  In the third quarter of 2009, Digital Imaging sales were $535 million (a 35% decline from the prior year quarter), Graphic Communications sales were $674 million (an 18% decline from the prior year quarter), and Film sales were $572 million (a 25% decline from the prior year quarter).  Kodak admitted that its ability to improve in the following quarter was predicated on a "modest market improvement, the introduction of new, higher-margin digital cameras and devices, stronger demand for its Prepress products, and the benefits from a number of intellectual property transactions."  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (October 29, 2009).

126.    The loss for the full year 2009 would end up totaling $232 million, or ($0.87) per share.  The revenue for that year was down 19% from 2008.  *See* Eastman Kodak Company, Current Report (Form 8-K*)*, Exhibit 99.1 (January 28, 2010).

127.    In the second quarter of 2010, Kodak was posted a loss of $167 million, or $0.62 per share.  Predictably, the Film segment was greatly weighing on the results, with sales of $466 million, representing a 21% decline from the year-prior quarter.   Similarly, Graphic Communications sales were $656 million, as compared to $670 million in the prior year quarter, and Digital Imaging sales were $447 million, compared with $503 million in the prior year quarter.  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (July 28, 2010).

128.    Kodak's third quarter 2010 loss was $43 million.  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (October 28, 2010); "Strength of Inkjet Printer Sales Narrows Kodak's Loss," *The Associated Press* (October 29, 2010), available at: http://www.nytimes.com/2010/10/29/business/29kodak.html.

129.   The Company's full year 2010 net loss totaled $58 million, or ($0.22) per share, with the Film segment posted an additional 22% decline in sales from the prior year.  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (January 26, 2011).

### E.   The Company's Deterioration Continues in 2011

130.   By the beginning of 2011, the Company's low-end camera sales were suffering, and rising silver and aluminum prices were having a disastrous impact on the digital printing plate and film business.  The Company's survival depended upon finding another way to raise revenue.  *See* Ben Dobbin, "Earnings Preview: Kodak to Report 4Q Results," *The Associated Press* (January 24, 2011), available at: http://www.sddt.com/Community/article.cfm?Sourcecode=20110124fv&Com_ID=63.

#### 1.   Kodak's Strategy To Generate Cash-Flow From Patent Lawsuits Would Prove to Be Only a Temporary Fix

131.   In January 2011, Kodak filed a complaint against Apple Inc. ("Apple") and Research in Motion Ltd. ("RIM"), claiming that Apple's iPhone and RIM's camera-enabled BlackBerry infringe on Kodak's patent on a method for previewing images.  This was part of Kodak's strategy to raise revenue through filing lawsuits against each and every company it suspected of using its patents without authorization.  *See* Michael J. De La Merced, "Eastman Kodak Files for Bankruptcy," *NYTimes.Com*, January 19, 2012, at 1.  The idea was that the settlements and judgments from these lawsuits would replace some of the lost revenue from sharply declining film sales.  *Id.*

132.   Raising revenue through litigation proved to be a short-sighted strategy as the flow of settlements dried up in 2011.  *See* Dana Mattioli, "Kodak Shutters Camera Business," *The Wall Street Journal* (February 10, 2012), at B3.

133.    To put the final nail in the coffin of Kodak's litigation strategy, on January 24, 2011, a U.S. International Trade Commission ("ITC") judge determined that Kodak's claim against Apple and RIM was invalid.   *See* Jennifer Saba, "Kodak Loss Mounts on Digital Sales," Shares Fall, *Reuters* (January 26, 2011), available at: http://www.reuters.com/article/2011/01/26/kodak-idUSN2615983920110126.

## 2.      Kodak Faces Severe Liquidity Crunch

134.    Although Kodak reported a net loss of $249 million, or ($0.92) per share for the first quarter of 2011, the Company asserted that the results reflected the "continued momentum" of the core digital growth business.  Specifically, revenue from the Consumer and Commercial Inkjet, Packaging Solutions, and Workflow Software & Services increased by 23%, with a 50% increase in Consumer Inkjet.  Defendant Perez asserted that the Company's "strategy is working," stating that the Company was off to a good start for the year, and would complete the transformation into a "sustainable, profitable company" the following year.  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (April 28, 2011).

135.    Clearly, Kodak's strategy was not working.  On July 20, 2011, it was reported that Kodak might sell over 1,100 digital-imaging patents in order to raise money for operations.  This was to include patents for, among other things, editing, processing and storing digital images, and was said to represent 10% of the Company's patent portfolio.

136.    Kodak's second quarter 2011 loss from operations of $179 million, or ($0.67) per share, announced a week later, only underscored the fact that the Company continued to face tremendous financial difficulty.  While sales of inkjet printers continued to surge, slumping revenue on film and digital camera sales weighed heavily on the financial results.  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (July 26, 2011).

137.    On this day, Kodak stock closed at $2.39 per share.

138.    As *The Wall Street Journal* reported after the earnings announcement, Kodak "lost much of its film business to foreign competitors, then mishandled the transition to digital cameras.   Now it is quickly burning through its cash as it remakes itself into a company that sells printers and ink."   Further, Kodak's junk rated debt (due in 2013) was then valued at 80 cents on the dollar.   *See* Dana Mattioli *et al.*, "Kodak Struggles to Find Its Moment," *The Wall Street Journal* (August 11, 2011), available at: http://online.wsj.com/article/SB10001424053111903454504576488033424421882.html.

139.    *Forbes* presented an interesting take on the potential value of Kodak's patents, pointing out that generally speaking, investment bankers value assets (such as patents) based on the past selling prices of similar goods.   There was evidence to suggest that some of the recent merger and acquisition activity in the market had been more focused on maintaining competitive advantage for certain companies rather than on the true value of the acquired patents.   As such, it was possible that past acquisition activity had artificially inflated the value of the patents, meaning that the actual value of Kodak's patent portfolio could be much less than presumed. *See* Robert Stammers, "Is Kodak Worth $3 Billion?," *Forbes* (August 30, 2011), available at: http://www.forbes.com/sites/cfainstitute/2011/08/30/is-kodak-worth-3-billion/.

140.    As Kodak was facing ever more dire circumstances, the news of its financial troubles was beginning to impact its printer sales, which was the business line that was supposed to save the Company.   Simply put, consumers and businesses had trepidation about buying a product from a Company on the verge of bankruptcy, for fear that the product would no longer be supported.   Fears that Defendant Perez would be unsuccessful with the turnaround plan caused certain buyers to turn to other companies, such as HP.   *See* Chris Burritt, "Kodak's Revival Effort Came Five Years Too Late, Perez Says," *Bloomberg* (September 2, 2011),

available at:  http://www.bloomberg.com/news/2011-09-01/kodak-loses-customers-to-hp-as-ceo-perez-s-turnaround-stalls.html.

141.    By September 2011, Kodak's situation had become so dire that it tapped $160 million of a $400 million credit facility.  The Company only stated that the cash would be used for "general corporate purposes."  This was announced on September 27, 2011, the day after intangible-asset firm M.Cam reported that 31% of Kodak's patents were impaired by carelessness in patent filings and other breakdowns in quality.  As such, the commercial value of these patents was seriously questioned.  *See* Chris Nuttall, "Cash Call Sends Kodak Shares Down 27%,"  *Financial       Times*  (September       27,       2011),       available       at: http://www.ft.com/intl/cms/s/2/5702f4b2-e875-11e0-8f05-00144feab49a.html#axzz1kawEHhC9.

142.    Three days after tapping the credit facility, Kodak announced that it was weighing options, including a bankruptcy filing, largely due to "concerns" raised by potential patent portfolio bidders.  Many of the potential bidders were hesitant to acquire the patents due to the possibility that a purchase could amount to a "fraudulent transfer" if Kodak in fact became insolvent.  *See* Jonathan Keehner *et al.*, "Kodak Weighing Bankruptcy to Spur Patent Sale," *Bloomberg* (October 1, 2011), available at:    http://www.bloomberg.com/news/2011-09-30/kodak-said-to-weigh-bankruptcy-filing.html.

143.    By the end of October 2011, it was widely reported that Kodak was seeking to sell off its entire patent portfolio.  A Kodak spokesman tried to soften the blow (and counter the idea that Kodak would have nothing of value remaining) by stating that it was the Company's "intention to retain a license to any of the intellectual property we sell."  The spokesman likened it to selling a property but still living in the house.  *See* Ben Dobbin, "Can Kodak Rescue Itself

via a Patent Bonanza?," *The Associated Press* (October 31, 2011), available at: http://www.usatoday.com/tech/news/story/2011-10-31/kodak-patent-push/51012188/1.

144.    On November 3, 2011, Kodak announced what many had known for quite some time: the Company's survival over the next year depended either raising new debt or on completing a multi-billion dollar patent sale. The Company stated that it needed the money in order to monetize the digital imaging patent portfolio. *See* Liana Baker, "Kodak Looks to Patent Sale to Survive," *Reuters* (November 3, 2011), available at: http://business.financialpost.com/2011/11/03/kodak-looks-to-patent-sale-to-survive/.

145.    On the day of this announcement, Kodak stock closed at $1.12 per share.

146.    Kodak's plan to sell patents or borrow money turned out to be a difficult proposition. Kodak had been in discussions with Cerberus Capital Management LP and Highbridge Capital Management LLC for a financing package of $900 million, but in late December 2011 the hedge funds lowered their offer, stating that they were willing to provide between $600 million and $700 million. This amount, however, was believed to be insufficient to keep Kodak afloat. At this point, a bankruptcy auction of Kodak's patents appeared more likely, and as possibly yielding a better outcome for the Company. Had the Company sold assets while insolvent and later declared bankruptcy, creditors could sue to claw back the assets or obtain more money beyond the proceeds from the sale. As such, bidders are often hesitant to purchase patents from a Company facing bankruptcy. If the assets were sold at a bankruptcy auction presided over by a judge, this outcome becomes extremely unlikely. *See* Dana Mattioli *et al.*, "Kodak's Rescue Plans Hit Hurdles," *The Wall Street Journal* (December 19, 2011), available                                                                                                      at: http://online.wsj.com/article/SB10001424052970203733304577102791500582140.html.

147.    December 2011 saw the resignation of three board members:  Defendant Tyson, Defendant Clammer and Defendant Chen.  Further, December 7, 2011 marked the last day that Kodak stock traded above $1.00 per share; the next day, Kodak shares closed at $0.95 per share, and have never again reached $1.00.

148.    On December 27, 2011, Kodak received a notice from the New York Stock Exchange that its stock was below the continued listing criteria, with shares trading at an average closing price of less than $1.00 over a consecutive 30-trading-day period.  Under NYSE rules, the Company would have six months to regain compliance with the minimum share price requirement.  *See* Eastman Kodak Company, Current Report (Form 8-K), Exhibit 99.1 (January 3, 2012).

149.    On January 4, 2012, Kodak announced that it was readying papers for a Chapter 11 bankruptcy filing.

150.    As *The Wall Street Journal* pointed out, one of the factors that crushed Kodak was its costly pensions.  According to the article, "the decision to pitch expensive obligations into an uncertain future proved crippling."  Ironically, the retirees to whom Kodak owed these pension obligations would now become the victims of the Company's turmoil.  Moreover, these enormous obligations served to make the Company unattractive as a takeover target.  Further, as the article stated, "when a company starts to sell its intellectual property, hacking off an arum here and a leg there, you know the end is near."  *See* John Bussey, "Kodak's Long, Slow Slide," *The Wall Street Journal* (January 4, 2012), available at: http://online.wsj.com/article/SB10001424052970203471004577141223745435682.html.

151.    On January 5, 2012, Kodak's Chief Communications Officer Gerard Meuchner resigned from the Company.  *See* Dana Mattioli, "Kodak Departures Continue As

Communications Chief Leaves," *The Wall Street Journal* (January 5, 2012), available at: http://online.wsj.com/article/SB10001424052970203513604577142913715793308.html.

152.    Also on January 5, 2012, Moody's downgraded Kodak's corporate family and probability-of-default ratings to Caa3 from Caa2, its senior unsecured debt to Ca from Caa3, and its senior secured debt to Caa1 from B3 – all three junk grade ratings, and Moody's outlook for the Company remained negative. *See* "Moody's Downgrades Eastman Kodak," *The Associated Press* (January 5, 2012), available at: http://www.businessweek.com/ap/financialnews/D9S318IO0.htm.

153.    On this day, Kodak stock closed at $0.42 per share and bankruptcy was near.

### F.    Last Ditch Effort to Save Company Fails

154.    On January 10, 2012, Kodak announced that it had reduced its number of business segments from three to two:  The new segments were now the Commercial Segment and the Consumer Segment.  Both of these segments were to report to a newly created Chief Operating Office.  With respect to the reorganization, Defendant Perez stated:  "This new structure simplifies the organization, focuses it more precisely on our consumer and commercial customers, and puts the right people in place to capitalize fully on the tremendous technological capabilities of Kodak. These business structure changes also allow us to allocate resources more productively, continue to significantly reduce administrative costs, and improve efficiency. We are confident that these changes will support our efforts to make the most of our opportunities." *See* "Kodak Creates new Business Structure to Accelerate Digital Transformation," available at: http://www.kodak.com/ek/US/en/Kodak_Creates_New_Business_Structure_to_Accelerate_Digital_Transformation.htm.

155.    On January 10, 2012, Kodak announced that it filed *another* lawsuit with the ITC, this time against Apple and HTC Corporation, asserting infringement on four patents.

Additionally, the complaint filed against HTC asserted an infringement claim based on the same patent at issue in the pending ITC action against Apple and RIM, filed in January 2010. *See* "Kodak Alleges Patent Infringement Against Apple, HTC," available at: http://www.kodak.com/ek/US/en/Kodak_Alleges_Patent_Infringement_Against_Apple_HTC.htm.

156.   Kodak also appears to have tried to delay bankruptcy "by using questionable pension accounting assumptions to overstate their earnings." *See* David Trainer, "Sell Kodak Before It's Bankrupt," MarketWatch (January 6, 2012), available at: http://www.marketwatch.com/story/sell-kodak-before-theyre-bankrupt-2012-01-06.

157.   These efforts by Kodak were futile.   On January 19, 2012, Kodak filed for bankruptcy protection.  From the last figures available, Kodak went into bankruptcy with nearly $1.6 billion in debt and $900 million in cash on its balance sheet.  *See* http://www.dailyfinance.com/2012/01/20/eastman-kodak-how-a-ceo-destroys-an-icon/.   On the day of its bankruptcy filing, Kodak stock closed at $0.30 per share.

158.   *Bloomberg* reported that Kodak's post-bankruptcy plan was to place printers with high volume users today (sometimes at loss), and profit from ink and service sales tomorrow. Thus, Kodak was seeking to revert back to its razor blade formula.  *See* Beth Jinks and Mary Childs, "Kodak Bankruptcy May Bet on Printing, Photography," *Bloomberg* (January 20, 2012), available at:    http://www.bloomberg.com/news/2012-01-19/kodak-bankruptcy-may-shed-photography-bet-on-digital-printing.html.

**Defendants Knew or Should Have Known that Kodak Stock Was an Imprudent Investment for the Plans, Yet Took No Action**

159.   During the Class Period, Defendants knew or should have known that the Company's business model and risk profile had completely changed from years past and that the

Company's stock was no longer a prudent investment for the Plans, but Defendants did nothing to protect the significant investment of the Plans' participants' retirement savings in Kodak stock.

160.    As a result of the complete erosion of the value of Company stock, the Plans' participants suffered unnecessary and unacceptable losses.

161.    Because of their high ranking positions within the Company and/or their status as fiduciaries of the Plan(s), Defendants knew or should have known of the existence of the above-mentioned problems.

162.    Defendants knew or should have known that, due to the Company's steadily and continuously deteriorating condition the Company stock price would suffer and devastate participants' investments.  Yet, Defendants failed to protect the Plans and their participants from foreseeable losses.

163.    In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plans to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.  Defendants also failed to conduct an appropriate investigation into whether Kodak stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding Kodak's problems so that participants could make informed decisions regarding whether to include Kodak stock in their Plan accounts.

164.    An adequate, or even cursory, investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Kodak stock was imprudent.  A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

165.   Because Defendants knew or should have known that Kodak was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Kodak stock.

166.   Defendants had available to them several different options for satisfying this duty, including, among other things:   divesting the Plans of Kodak stock; discontinuing further contributions to and/or investment in Kodak stock under the Plans; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that, as a result of their employment by Kodak, they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Kodak stock.

167.   Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plans' investment in Kodak stock.   In fact, Defendants continued to invest and to allow investment of the Plans' assets in Company stock even as Kodak's problems came to light.

**At Least Certain of Defendants Suffered from Conflicts of Interest**

168.   Kodak's SEC filings during the Class Period, including Form DEF 14A Proxy Statements, make clear that a portion of directors and certain officers' compensation was in the form of stock option awards.  *See, e.g.*, *See* Kodak Bancorp, Definitive Proxy Statement (Form DEF 14A), at 31 (March 30, 2011).

169.   As of March 1, 2011, the Director Defendants and Administrative Committee Defendants held approximately 4.2 million shares of Kodak stock, representing over 1% of the total outstanding Kodak shares. *Id.*

170.    Because the compensation of at least some of the Defendants was significantly tied to the price of Kodak stock, at least certain if not all Defendants had incentive to keep the Plans' assets invested in Kodak stock.  Elimination of Company stock as an investment option or vehicle for the Plans would have reduced the overall market demand for Kodak stock and sent a negative signal to Wall Street analysts, the results of which would have adversely affected the price of Kodak stock and thereby reduced the compensation for at least certain Defendants.

171.    Some Defendants may have had no choice in tying their compensation to Kodak stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the retirement savings of the Plans' participants and beneficiaries tied up to a large extent in Kodak stock.

172.    These conflicts of interest put certain Defendants in the position of having to choose between their own interests as directors/executives and stockholders and the interests of the Plans' participants and beneficiaries, whose interests Defendants were obligated to loyally serve with an "eye single."

173.    Thus, certain of the Defendants' interests were not aligned with those of the Plaintiffs and the Class, whose assets were decimated by continued investments in Company stock as Kodak's share price plummeted.

## CLAIMS FOR RELIEF UNDER ERISA

174.    At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

175.    ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

176.    ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches

any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

177.    ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

178.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).    They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)    A duty to disclose and inform, which encompasses:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

179.    ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

45

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

180.    Plaintiffs therefore bring this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

### FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLANS' ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 AND 405 BY ALL DEFENDANTS)

181.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

182.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

183.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

Defendants here were responsible for ensuring that all investments in the Company's stock in the Plans were prudent, and that such investment was consistent with the purpose of the Plans. Defendants are liable for losses incurred as a result of such investments being imprudent.

184.    A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.    ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may a fiduciary allow others, including those whom it directs or who are directed by the plan, including plan trustees, to do so.

185.    A defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan.

186.    Defendants here breached their duties to prudently and loyally manage the Plans' assets.  During the Class Period these Defendants knew or should have known that, as described herein, the Kodak common stock was not a suitable and appropriate investment for the Plans. Investment in Company stock during the Class Period did not serve the Plans' stated purpose. Yet, during the Class Period, despite their knowledge of the imprudence of the investment,

Defendants failed to take any meaningful steps to protect the Plans and the Plans' participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

187.    Defendants further breached their duties of loyalty and prudence by failing to cease investment or divest the Plans of Kodak stock when they knew or should have known that it was not a suitable and appropriate investment for the Plans.

188.    Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook.  During the Class Period, upon information and belief, the Company fostered a positive attitude toward the Company's stock, and/or allowed participants in the Plans to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, participants in the Plans could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans.

189.    Defendants also breached their co-fiduciary obligations by, among their other failures knowingly participating in, or knowingly undertaking to conceal, each other's failure to disclose crucial information regarding the Company's operations.  Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plans, yet made no effort to remedy them.

190.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a

significant portion of their retirement investment.  Had Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company stock and thereby eliminated, or at least reduced, losses to the Plans.

191.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE DIRECTOR DEFENDANTS)

192.    Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

193.    At all relevant times, as alleged above, the Director Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

194.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty—that is, a duty to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

195.    The Director Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to timely engage independent fiduciaries who could make independent judgments concerning the Plans' investments in the Company's own securities, and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plans' investment in Company stock.

196.     As a consequence of the Director Defendants' breaches of fiduciary duty, the Plans suffered millions of dollars in losses.  If the Director Defendants had discharged their fiduciary duties to prudently manage and invest the Plans' assets, the losses suffered by the Plans would have been substantially minimized or avoided altogether.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement savings.

197.     Pursuant to ERISA c 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), the Director Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties.

## COUNT III

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE DIRECTOR DEFENDANTS)

198.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

199.     This Count alleges fiduciary breaches against the Director Defendants.

200.     At all relevant times, as alleged above, the Director Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

201.     At all relevant times, as alleged above, the scope of the fiduciary responsibility the Director Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including, without limitation, the Administrative Committee and other Company officers, employees and agents to whom fiduciary responsibilities were delegated.

202.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the Director Defendants, as monitoring fiduciaries, had the duty to:

(a)    Ensure that the monitored fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties.  They must be knowledgeable about the operations of the Plans, the goals of the Plans, and the behavior of the Plans' participants;

(b)    Ensure that the monitored fiduciaries are provided with adequate financial resources to do their job;

(c)    Ensure that the monitored fiduciaries have adequate information to do their job of overseeing the Plans' investments;

(d)    Ensure that the monitored fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the monitored fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plans' investments; and

(f)    Ensure that the monitored fiduciaries report regularly to the monitoring fiduciaries.  The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

203.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

204.    Here the Director Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the monitored fiduciaries had access to knowledge regarding the Company's business problems alleged above, which made Company stock an

imprudent retirement investment, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Company stock, an investment that was imprudent and subject to inevitable and significant depreciation. The Director Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (i) continuing to invest the assets of the Plans in Kodak common stock when it no longer was prudent to do so, and (ii) imprudently allowing the Plans to continue offering Kodak stock as an investment alternative. Despite this knowledge, the Director Defendants failed to take action to protect the Plans, and concomitantly the Plans' participants, from the consequences of these fiduciaries' failures.

205.   In addition, the Director Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information concerning the financial condition of Kodak that they knew or should have known that these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, the Director Defendants breached their monitoring duties under the Plans and ERISA.

206.   The Director Defendants are liable as co-fiduciaries because they knowingly participated in the each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

207.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, lost a significant portion of their retirement investments.

208.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

209.     The Plans suffered millions of dollars in losses because substantial assets of the Plans were imprudently invested, or allowed to be invested by Defendants, in Company stock during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plans' participants.

210.     Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plans and their participants would have avoided a substantial portion of the losses that they suffered through the Plans' continued investment in Company stock.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

211.     As noted above, as a consequence of Defendants' breaches, the Plans suffered significant losses.

212.     ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

213.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable

alternative investment available.  In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

214.    The Plans, Plaintiffs and the Class are therefore entitled to relief from Defendants in the form of:  (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

215.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.      Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the Plans' participants' individual accounts in proportion to the accounts' losses;

E.      An Order that Defendants allocate the Plans' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of Kodak maintained by the Plans in proportion to the accounts' losses attributable to the decline in Kodak's stock price;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G       An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED:  February 15, 2012                    Respectfully submitted,

**BLITMAN & KING LLP**

By: s/ Jules L. Smith
      Jules L. Smith
The Powers Building, Suite 500
16 West Main Street
Rochester, New York 14614
Tel: (585) 232-5600
Fax: (585) 232-7738

Edward W. Ciolko
Peter A. Muhic
Mark K. Gyandoh
Julie Siebert-Johnson
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Rd
Radnor, PA 19087

Telephone: (610) 667-7706
Facsimile:  (610) 667-7056

*Counsel for Plaintiffs*